**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Luke W. Sironski-White (State Bar No. 348441)
Karen B. Valenzuela (State Bar No. 357231)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ndeckant@bursor.com
          lsironski@bursor.com
          kvalenzuela@bursor.com

**LYNCH CARPENTER, LLP**
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Scott G. Braden (SBN 305051)
scott@lcllp.com
1234 Camino del Mar
Del Mar, CA 92014
Tel:   619-762-1910
Fax:   858-313-1850

*Attorneys for Plaintiffs*
*and Proposed Class Counsel*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID CAVALIERE and DALLAS LEBLANC, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>ALTERNATIVE VENTURES LLC, doing business as PRESS'D,<br><br>　　　　　Defendant. | Case No.　　2:25-cv-137<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

CLASS ACTION COMPLAINT

Plaintiffs David Cavaliere and Dallas LeBlanc ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated, against Defendant Alternative Ventures LLC, doing business as PRESS'D ("Defendant" or "PRESS'D"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This is a civil class action against Defendant for its false, misleading, deceptive, and negligent sales practices regarding its 7-Hydroxymitragynine ("7-OH") tablet products[1] (collectively, the "7-OH Products," the "Products," the "7-OH Tablets," or the "Tablets"). 7-OH is an alkaloid (psychoactive chemical) found in the kratom plant (*mitragyna speciosa*). Kratom is both a plant and a drug. The plant originates from Southeast Asia where its leaves have long been ingested to produce stimulant and opiate-like effects. Use of kratom in the United States was practically non-existent until the last decade. Since then, kratom has become a massively popular substance. This is because it is currently legal to consume, and because of the stimulant and opiate-like effects produced by its two major alkaloids: 7-OH and mitragynine.

2.     However, what consumers do not know is that the opiate-like effects produced by mitragynine and 7-OH are not the result of novel chemical interactions in the brain. Rather, these alkaloids behave, in part, exactly like opioids. That is, the mitragynine and 7-OH alkaloids found in the kratom plant bind to the same opioid receptors in the human brain as morphine, heroin, and other opiates/opioids.[2] Consequently, kratom consumption has the same risks of addiction, dependency, and painful withdrawal symptoms, among various other negative side effects as traditional opioids.

---

[1] This includes Defendant's (1) Blue tablets in all sizes; (2) Red-OH Tablets; and (3) Hulk Blend tablets.

[2] An opiate is a substance derived from opium whereas an opioid is any substance that binds with the mu-opioid receptor.

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED                    1

3.    But it gets worse.  While both active alkaloids in kratom interact with the opioid receptors, 7-OH is substantially more potent than mitragynine.  Indeed, some studies have shown that 7-OH is ten times more potent than morphine in activating the mu-opioid receptor, which is the receptor associated most strongly with opioid addiction.

4.    7-OH does not appear in great quantities in raw kratom, making up less than 0.05% of kratom powder by weight.  For raw kratom powder consumers this means that normal doses of kratom powder do not contain enough 7-OH to produce the intense narcotic effects (and concomitantly strong withdrawals) characteristic of traditional opioids.  This is not to say that kratom can be consumed with abandon—kratom is highly addictive and will induce opioid withdrawal symptoms if taken too frequently—rather, this is to say that in comparison to raw kratom addiction, the withdrawal symptoms from pure 7-OH consumption will be substantially worse.

5.    Defendant does not sell raw kratom.  Defendant's Tablets are pure 7-Hydroxymitragynine.  18mg of it to be precise.  This makes Defendant's 7-OH Tablets more addictive than kratom, and the withdrawal symptoms significantly worse.

6.    Almost as soon as Defendant's Tablets hit the market the horror stories began to surface.  Consumers stating that they were blindsided by these Tablets, thinking they were just a different form of kratom, and suffering through the worst withdrawal symptoms they had ever experienced – worse than heroin by some accounts.

7.    The general public is largely unaware of kratom and its addictive potential. So, when it comes to "7-Hydroxymitragynine," a derivative of kratom with a torturously complex name, the public is even less aware of it and its negative effects.

8.    When reasonable consumers think of opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, or morphine—they do not think of 7-OH Tablets or expect the "kratom alkaloid" product sold at their local gas stations or corner stores to act like an opioid or have the same addiction and dependency risks as opioids.  7-OH is extremely addictive and, as a result, tens of thousands of unsuspecting consumers have developed 7-

OH dependencies that have caused them serious physical, psychological, and financial harm.

9.      Defendant has intentionally failed to disclose these material facts regarding the dangers of 7-OH consumption anywhere on its 7-OH Tablets' labeling, packaging, or marketing material.  As a result, Defendant has violated warranty law and state consumer protection laws.

10.      Defendant relies on its Products' vague packaging and consumers' limited knowledge of 7-Hydroxymytragynine to get unsuspecting people addicted to its Products and reap substantial profits from these addictions.  Defendant relies on this ignorance and does almost nothing to correct it.[3]  Such activity is outrageous and is contrary to California law and public policy.

11.      Plaintiffs seek relief in this action on behalf of themselves, and as a class action, on behalf of similarly situated purchasers of Defendant's Products, for the following violations of: (i) California's Unfair Competition Law, Business and Professions Code §§ 17200, *et seq*. (the "UCL"); (ii) California's Consumers Legal Remedies Act, Civil Code §§ 1750, *et seq.* (the "CLRA"); (iii) California's False Advertising Law, Business and Professions Code §§ 17500, *et seq*. (the "FAL"); (iv) breach of implied warranty; (v) unjust enrichment; and (vi) fraud by omission.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2), because this case is a class action where the aggregate claims of all members of the proposed Classes (defined below), exclusive of

---

[3] During the drafting of this complaint, it appears Defendant became partially aware of its duty to consumers because in late 2024 Defendant updated its website, www.itspressd.com, to now include a pop-up box, which informs consumers about the risk of addiction posed by its Products.  While this is commendable, this does nothing to repair the harm done to consumers in the two years prior.  Nor does it absolve Defendant of its ongoing duty to inform consumers about the risks of addiction on the Products' packaging.

---

interest and costs, exceed the sum or value of $5,000,000 and at least some members of the proposed Classes, have a different state citizenship from Defendant.

13.    This Court has personal jurisdiction over Defendant because Defendant is an entity with constitutionally sufficient contacts with this District to make personal jurisdiction in this Court proper.

14.    Venue is proper in this District because Defendant sold its Products to consumers in this District.  And Plaintiffs were harmed by Defendant's actions in this District.

## GENERAL ALLEGATIONS

**A.    Background and Pharmacology of Kratom and 7-Hydroxymitragynine**

15.    "Kratom" refers to the substance derived from the leaves of a tropical plant, *mitragyna speciosa* (the "kratom plant"), indigenous to Southeast Asia, where it has been used in herbal medicine since the 19th Century.  Kratom's first reported use in scientific literature was in 1836, when it was noted that Malays used kratom tree leaves as a substitute for opium.  Historic use of the kratom plant was particularly well-documented in Thailand, Indonesia, and Malaysia, where kratom remains popular to this day.

16.    Kratom is the most widely used drug in Thailand.  This popularity does not mean Thailand believes kratom is harmless.  To the contrary, Thailand understands that kratom is dangerous, as demonstrated by its ban of the substance in 1943.[4]  Kratom was also historically popular in Malaysia until it was banned in 1952 under the Poisons Act.

17.    Kratom's unknown and inconsistent effects have historically been part of its appeal.  For instance, the earliest accounts of kratom characterize kratom use for both a stimulant effect during hard day-labor by chewing fresh kratom leaves, and also for an analgesic or relaxing effect by brewing kratom into a tea.

---

[4] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together.  However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

18.     In the Western world, kratom is sold online and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or natural supplement to use to "treat" a variety of ailments (e.g., pain, mental health, opioid withdrawal symptoms), and/or to obtain a "legal" or "natural" high.

19.     To create consumable kratom products, kratom plant leaves are harvested, dried, and crushed into a fine powder that is then packaged and sold in pouches, capsules, or liquid formulations.[5]

20.     The chemicals in the kratom plant, which produce a psychoactive effect when ingested, are called "alkaloids."  "Alkaloids" are a class of various naturally occurring organic chemical compounds.  The primary alkaloids in kratom leaves responsible for kratom's effects are mitragynine ("MG") and 7-Hydroxymitragynine ("7-OH").

21.     MG and 7-OH produce a wide spectrum of effects because they interact with many different receptors in the brain.  Studies show that MG and 7-OH interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), all of which contribute to kratom's mood-lifting and stimulant-like effects.

22.     Defendant's Products are unique as compared to most other kratom products on the market and represent a "next gen" iteration of the substance in terms of addictiveness and harm-potential.  They are an isolated and concentrated version of kratom, making 7-OH the primary active alkaloid and stripping the rest away.

23.     Compared with raw kratom, 7-OH typically only occurs in doses that are no greater than 2% of total alkaloid content (or 0.05% by weight).  In Defendant's Products, however, 7-OH makes up 100% of the total alkaloid content.

24.     7-OH is different than MG because, although both interact with the mu-opioid receptor,[6] MG has a dramatically lower affinity for the mu-opioid receptor, whereas 7-OH

---

[5] When kratom leaves are extracted into a liquid formulation, this is colloquially called a kratom "extract shot."

[6] The mu-opioid receptor produces the most addictive or habit-forming effects, such as euphoria and analgesia.  For this reason, the mu-opioid receptor is known as "the gateway

has an affinity for the mu-opioid receptor that is comparable to—or greater than—opioids like Percocet, morphine, and oxycontin.  Studies have shown that when 7-OH is administered in concentrated, isolated doses, it presents a significantly greater risk of inducing physical and mental addiction in consumers than raw kratom.  Yet, consumers are largely ignorant of this fact.

25.    For instance, while both 7-OH and MG target the opioid-receptors, 7-OH's effect on the opioid receptors is approximately forty-six times that of MG, and thirteen times that of morphine.[7]

26.    Thus, kratom is by definition an "opioid," and so is 7-OH.

27.    Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms, which users feel compelled to avoid by taking more of the drug.  The tragedy of addiction is that users want to stop but cannot.

28.    All substances that act on the opioid receptors have a high risk of addiction, and 7-OH is no exception.  Addiction occurs when an opioid is ingested on a regular basis and, over time, the user develops a tolerance to the drug that requires the user to consume an increased dose of the drug to achieve the same effects a lower dose previously had.  As these doses increase, the body becomes dependent on the drug to feel normal and function properly.  When the drug is suddenly taken away or the user tries to stop taking the drug, withdrawal occurs.  Withdrawal symptoms cause the user to feel much worse than they did before they started taking the drug and can be extremely painful and intolerable to the user.

29.    Indeed, 7-OH withdrawal symptoms are very similar to those of traditional opioid withdrawal.  These symptoms include irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and

---

to addiction" because it is the receptor that all opioids interact with to produce the classic opioid high feelings of euphoria, sedation, and pain relief.

[7] *Kratom—Pharmacology, Clinical Implications, & Outlook: A Comprehensive Review*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7203303.

bone pain, stomach pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, extreme dysphoria, and malaise.

30.    Users typically start substances like 7-OH because of how good it makes them feel, but once addicted, they use 7-OH to avoid the pain and sickness of withdrawal.  Use is no longer about getting high, but about not feeling "sick."

**B.    Kratom and 7-OH Use and Addiction in the United States**

31.    Over the past decade, kratom has exploded in popularity within the United States.  As of 2021, the American Kratom Association estimates that kratom is a $1.3 billion a year industry, with 11 million to 15 million annual users within the United States. Studies show that 1 million United States residents use kratom monthly, and that two-thirds of those users use kratom daily.

32.    Kratom's popularity is attributed to several factors: first, kratom is marketed as a safe substitute for painkillers and so it appeals to consumers who falsely equate "natural" with "safe;" second, kratom has received media attention as a "nootropic" or "smart" drug because it is stimulating at low doses; third, kratom is widely available and unregulated within the United States; fourth, it produces a "pleasurable" high; and lastly, users are unaware of kratom's opioid-like characteristics, addiction, and withdrawal potential.

33.    7-OH is new to the market.  Having only arrived in 2022 or even more recently.  Defendant's Products, for instance, came to market in 2023.

34.    Kratom is still a relatively unknown substance to the average consumer, and most people have never heard of it.  This is doubly true of 7-OH.  Even if consumers have heard of kratom they may not have heard of 7-OH.

35.    7-OH sellers advertise it as a substitute for coffee or a kratom derivative of equal potency, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, and that it improves focus and gives users a boost of energy to get through the day.  Some even assure consumers that 7-OH is a <u>non-addictive</u> way to deal

with opioid withdrawal.  These 7-OH companies universally reiterate these purported "benefits" of 7-OH consumption, without disclosing any of its corresponding harms.

36.    As a result of 7-OH manufacturers', retailers', and advertisers' failure to warn consumers of 7-OH's addictive potential, many 7-OH users find themselves blindsided when they stop taking 7-OH and find themselves facing severe withdrawal symptoms after having stopped using what they thought was a harmless supplement.  Further, because 7-OH is relatively unknown in the United States, there are not well-established recovery resources for addicted users to turn to for resources and aid.  Some 7-OH users turn to the Internet for support, and there are well-populated and very active Internet forum support groups for consumers struggling with, and recovering from, kratom addictions.

37.    The reports from people addicted to 7-OH are heart-wrenching.  Consistent among these reports is a feeling of initial shock when users realized they had become unknowingly addicted to 7-OH, and how difficult it was to stop their 7-OH use.  Below are several accounts from the "Quitting Kratom" forum on www.reddit.com, which has over 47,000 members as of January 2025:[8]

> i.    In one post, a user wrote: ***Pressd 18mg blue tablets are the devil***. I've been taking 3 tablets daily for the last 40 days. It's gotten to the point to where I wake up around 3 am every morning with restless legs and aches because my body knows it needs its fix. So to get my fix I would take 8 kratom powder caps just to be able to fall back asleep which rarely worked. I'm spending between $650-$700 a month on pressd tabs and I finally broke down and told my wife. … Literally typing this with a tear running down my cheek. I wish I would have never found pressd and it's nothing but a [] demon on my back. The cravings for them will always be there and I wish this hell on nobody.

> ii.    In another post titled **Do no take 7oh**, a user wrote: I'm going to say this loud and clear for everyone in their early stages of quitting, currently, or have already quit. DO NOT take this 7oh shit. It's fucking poison. It's nothing like the extracts and it's a very VERY taxing drug on the body. I have done every single thing under the sun and I can honestly say with confidence that this is by far bar

---

[8] *See* https://www.reddit.com/r/quittingkratom.

none the absolute worst drug I've ever taken when it comes to detoxing.

iii.    In another post titled **Beware of 7-Hydroxymitragynine,** a user wrote**:** I ended up getting these extract pills that were 14mg of 7 Hydroxymitragynine per pill. Used them for about a week for some bad pain, and then got thrown into aggressive withdrawal. I've been on a now 3 month taper journey off of just a week of using them. It's been hell. Trying to get there slowly tapering. Just wanted to put the PSA out there, something like [7-OH] might be tempting, and it is incredible for pain, but it threw me into awful withdrawal that's now forced me to have to taper off of it and take a dose every 12 hours. This was after 2 and a half years of regular Kratom use that never gave me withdrawal. This week of using [7-OH] though mixed with my 2 and a half years of Kratom experience created a withdrawal shitstorm that was never expected. Beware.

a.    **Another user responded**: I don't know how you're cold turkey from [7-OH], I tried and it was worse than when I had to kick morphine. I've had to do a long and slow taper with 6grams of Kratom powder every 12 hours currently. The [7-OH] withdrawal is very scary, worse than any opiate I've been on.

b.    **Another User Responded**: I started taking those because the guy suggested them now it's every day for 3 months. I can't stop and get bad withdrawals at 24 hr mark. I'm taking about 6 a day now and I'm spending over 1K per month now it's going to ruin me if I don't stop. I can't believe this is legal, idk what to do

iv.    In separate post another user wrote: Guys I desperately need help. I have been taking [7-OH] for maybe 6 months. Like more than three a day. The more research I do on them the more I realize they're not even Kratom and no one scientifically really knows anything about them. I am going across the country tomorrow and am going to be CT for 8 days. I actually really want to stop and I've been trying to for a really long time, but I am terrified of the withdrawals. I don't know what to do. I actually upped my dose this week and have probably been taking more like five a day. I am so embarrassed to say that, I am now realizing that everyone is cautioning even the fucking American Kratom Society about these things. I'm really worried about my mental health not to mention I am going to be with my wife/kids and parents for 8 days. I don't know what I was thinking. Any recommendations?

v.    In another post titled **Could not and would not believe you all…**another user wrote: Long time lurker, first time poster. I went CT three days ago… after using for 1 1/2 years. The last 3 months I've been exclusively abusing the [7-OH] tablets, a full pack of three a day. I told myself you were all exaggerating.  I told myself you

were all weak. Now I'm completely humbled and fully ashamed. The last three days I've experienced a fatigue and fever like I've never experienced before. Trying to fall asleep and stay asleep, is absolutely impossible. During the night I sweat through my sheets…during the day I feel like a walking corpse. And I caved. I took half a tablet today just to stop the WD symptoms I was feeling. Now my brain just wants to rationalize what I've done. But I know, deep down this was the wrong move…I'm truly ashamed. I share this post for the people like me, who are lurking or glancing at this subreddit from time to time and telling themselves "naw I'll be fine…I can handle the WD whenever I decide or if I ever stop." I share this post for future me to look at to read and see the seriousness of my addiction and situation. I know that next time I quit I need to be more prepared. If you abuse it the way I do…Kratom is robbing you of life, and you trade it willingly for a 2 hour high. There's so much more to life than getting high. Thank you to this community, I hope you all know how much reading your stories and struggles does for someone like me. Thank you 🙏

38.    Other experiences with kratom (not necessarily 7-OH products) described on the subreddit are similarly horrifying:

    i.    **One user wrote:** I started using kratom in pill and powder form a couple years ago. I had no idea it was addictive, and I liked how it made me feel.... so much that I went from using it a couple weekends a month to wanting to use it every weekend to wanting to use it every day. I upped my dose a whole bunch, and soon I started to realize that, when I didn't take it, I would start to get what seemed like withdrawals! WTF? I googled it and did some more research and learned that I was indeed going through withdrawals. I immediately decided to suck it up and get off that stuff and spend a week withdrawing. Unfortunately, it wasn't that simple. I was addicted. That poison was in my mind constantly. I started using again and, LONG story short and many MANY other withdrawal attempts later, I had lost my JOB, my boyfriend, and my personality. It landed me in the hospital many times actually. I was losing hair, my eyes looked horrible, my skin was horribly dry, and I was miserable. I decided to go to REHAB. Effing rehab for this sh!t.

    ii.    **Another user shared:** I just tapered down from 80gpd to 20, and the experience was so awful that I just decided to jump yesterday, figuring "Let's just get this over with already!" Well, I gotta tell you, last night may have been one of the roughest nights of my life. It felt like a bad acid trip. I got zero sleep. The RLS was so bad I kept getting out of bed, bundling up, which was exhausting in itself, and going for a loop around the property outside; while hoping to be able to crawl back in bed and actually sleep. Nope. It felt like I was being electrocuted!!! This is even with clonidine and gabapentin. But, I'm

determined to NEVER go through that first night again! (And of course I was lamenting my rash decision to jump, and DYING to take some K). But, there's no turning back now. I'm hoping I'll get some sleep tonight since I had none last night. Wish me luck please :).

iii.   **Another user shared:** I was the worst kratom addict I knew and now I'm coming up on 5 months sober. Let me first qualify VERY quickly…  Multiple extract shots a day, crying on the way to the store, cut up all my credit cards multiple times (until I got Apple Pay), sent my credit cards to myself in the mail, got on oral naltrexone, got on vivitrol (the injectable shot), gave my wife my wallet, lied every day, ... Today I'm sober off of everything and almost 5 months clean. I don't crave alcohol or drugs anymore. Cravings were my biggest problem. I don't think about kratom all day any longer. I had to walk my sad @$$ all the way to a 12 step program in order to get help. I have to talk to other struggling people. I had to start working a program of recovery which i still work…My habit was $50 a day, and with a newborn and mortgage etc I'm still trying to climb out of that hole. But man, to go from complete self-hate to self-love makes everything worth it. I hated myself, not anymore.

39.   This Internet forum is filled with other accounts like these, and the stories are consistently the same: well-meaning people were looking to feel better by taking what they thought was an "herbal supplement," only to develop an opioid-like addiction.  This anecdotal evidence makes clear that 7-OH's addictive potential is a material fact to reasonable consumers that, if known, would help inform their purchase and consumption decisions.  However, Defendant's Products have no information whatsoever warning that 7-OH is similar to an opioid, is habit-forming, or that regular use will result in opioid-like dependency and withdrawal symptoms.

40.   Consumers who knew the truth about 7-OH may not have purchased Defendant's Products or would have paid less than they did for them.

**C.   Defendant Knew or Should Have Known They Were Selling a Highly Addictive Drug to Unsuspecting Consumers**

41.   Defendant manufactures its 7-OH Tablets in a highly specialized lab and utilizes highly technical knowledge about kratom and its alkaloids to synthesize its Products.  Thus, Defendant is acutely aware of the addiction risks posed by its Products.

---

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED                           11

42.     Despite this knowledge, Defendant failed to disclose 7-OH's addictive potential to its customers on its Products' packaging.

43.     Defendant has no excuse for its lack of a detailed disclaimer warning on its 7-OH Tablet's packaging of 7-OH's harms.  The pharmacological effects of 7-OH have been studied, and it is well-established that 7-OH acts on the same mu-opioid receptors in the brain as traditional opioids do.  Further, there are widespread reports and studies of other addiction and dependency issues.

44.     Defendant therefore knew or should have known that kratom and kratom-derivative users can develop an addiction.  Yet, Defendant fails to disclose this material fact on its advertisements or on its Products' packaging.

45.     The very fact that Defendant possesses the capability to manufacture its 7-OH Tablets shows that it understands the pharmacokinetic nature of 7-OH and the substantial risk of addiction that it poses to consumers.  Despite this, Defendant markets its 7-OH Products as if they are nothing more than over-the-counter supplements.  Indeed, the packaging looks more like candy than a dangerously strong opioid, and Defendant's glossy website and design language obfuscates the very truth that it is selling a strong narcotic to consumers who likely do not fully comprehend the risks associated with consuming the Products.

46.     For instance, in the image pictured below, taken from Defendant's website, Defendant gives customers a wink and a nod that 7-OH is a "distinctive alkaloid" that "produces remarkable effects [] designed to provide you with a potentially enjoyable experience."  Like Plaintiffs' experiences described below, consumers may walk into the local headshop and see Defendant's Products and be enticed into purchasing them because, they think, it looks inviting and if it was dangerous there would be a warning on the package.



7-Hydroxymitragynine is a terpenoid indole alkaloid found in the Kratom plant, also known as Mitragyna speciosa. It is an oxidized derivative and active metabolite of mitragynine. Experience the remarkable effects of this distinctive alkaloid, designed to provide you with a potentially enjoyable experience for a lifestyle that truly stands out.

47.    It gets worse.  Defendant's business name and the color and shape of its original blue tablet Products are an overt nod to counterfeit oxycodone tablets.  These tablets are known as "M30's," "pressies," or "blues."  Comparison images between street oxycodone and Defendant's blue Tablets are reproduced below.  On the left is a photograph of illegal oxycodone ("blues").  On the right is Defendant's Product.  The shade of blue is nearly identical, and Defendant even scores the pills.  This is outrageous, a moral and ethical failure, and in contravention of public policy.

 

***A comparison between illegal "street" oxycodone and Defendant's Blue Tablet Product***

48.    Aside from people well versed in street-level drug activities, reasonable consumers looking at the Products' packaging and online store description would not presume that 7-OH is highly addictive.

49.    Nowhere on the packaging does Defendant mention that 7-OH presents the same addiction risks or problems that former opioid users and any other consumers would want to avoid.  Consumers seeking help as they come off opioids may be drawn in by

Defendant's misleading statements about 7-OH without knowing that they risk trading one addiction for another.

50.    As a 7-OH product seller, manufacturer and/or distributor, Defendant occupies a position of superior knowledge to the average reasonable consumer, who likely knows nothing about 7-OH.

51.    Aside from the Blue tablets, Defendant also markets and sells green and red Tablets.  The green Tablets are called the "Hulk Blend" and the red Tablets are called "RED-OH."  Defendant advertises the RED-OH Tablets as "5X STRENGTH OF 7-OH."



52.    On Defendant's website homepage, it markets its 7-OH Tablets as the following:

> 7-Hydroxymitragynine, a compound found in the Kratom plant, is known to have several effects, which can vary depending on the dose. Some of the effects include:
>
> 1. Relief: It is believed to have an analgesic properties to have provide relief.
>
> 2. Sedation: At higher doses, it may induce sedation, making it helpful for those with insomnia or anxiety.

3.  Mood Elevation: It can have mood-enhancing effects, potentially alleviating symptoms of depression.

4.  Stimulation: At lower doses, it may provide a mild stimulant effect, increasing energy and focus.

53.   In this description, Defendant touts all the potential benefits of its 7-OH Products but fails to disclose on the Products' packaging the heightened harm and additional risk of addiction that corresponds with the increased potency of its 7-OH Products.

54.   Despite these "informative" introductions to its Products, until late 2024 nowhere in any of these disclaimers or descriptions did Defendant provide any warning to consumers on the Products' packaging that its Products interact with opioid receptors, are highly addictive, or have a potential risk of addiction, and should not be taken on a daily basis, or note any of the numerous negative side effects and withdrawal symptoms caused by its Products.

55.   Aside from its website now, the furthest that Defendant gets to disclosure is a back-of-the-package disclaimer that the "product may be harmful to your health," but does not specify what that harm may be or how it may manifest (*i.e.*, that it is harmful because it is addictive, or risks being addictive).

56.   A boilerplate disclaimer is plainly insufficient.  This is a Product that poses a serious risk of intense addiction and withdrawal in line with traditional "hard" opioids.

57.   Addiction is a disease.  As such, Defendant's 7-OH Tablets pose an unreasonable health hazard, and Defendant had and has a duty to disclose this fact *on its Products' packaging.*

58.   What's more, nothing about the Products' packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that function on the same mu-opioid receptors in the brain.  It looks as innocuous as a vitamin supplement.

59.   Defendant, through its misleading advertising and its failure to disclose 7-OH's addictive properties on its Products' labels, relied upon the average consumer's incomplete knowledge of 7-OH to better sell its Products and get users addicted to them.

60.    Defendant fails to disclose 7-OH's addictive potential because Defendant knows that it is a material fact to reasonable consumers that would influence their purchasing and consumption decisions, likely to Defendant's financial detriment.

61.    By any metric, Defendant's conduct is immoral, unethical, and contrary to California public policy.

62.    The United States is currently experiencing an opiate crisis that is shaking the foundations of our society.  Amid this crisis, Defendant is creating more addicts for no reason other than to line its pockets, without adequate disclosure of its Products' risks through the use of false and misleading packaging and marketing.  That cannot—and should not—stand, at least when Defendant's conduct entails breaches of warranty and violation of state consumer protection statutes as it does here.

63.    Accordingly, because the facts concern a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiffs and the members of the Classes the true standard, quality, and grade of the Products and to disclose the Products are—or potentially are—addictive.  Defendant also had a duty to disclose because of its exclusive and/or superior knowledge concerning the true nature and composition of the Product as the owner, manufacturer, producer, marketer, and seller of the Products.  Nonetheless, Defendant concealed this material information.

## PARTIES

64.    Plaintiff David Cavaliere is a resident of California.  He first purchased Defendant's Products in or around April 2024.  Plaintiff Cavaliere had been sober for about 3 years when he first purchased Defendant's tablets.  Plaintiff Cavaliere purchased the Product out of curiosity while at a smoke shop in Brea, California.  Plaintiff Cavaliere did not believe the Product to be harmful and he was not aware at the time of purchase that the tablets had a potential risk of being addictive.  Plaintiff Cavaliere reviewed the Product's packaging before making his purchase and relied on Defendant's representations in deciding to purchase the Product.  A warning on the Product packaging would have corrected his belief, but there was none.  Plaintiff Cavaliere started with half a tablet, but

quickly his tolerance grew, and he worked up to one to two tablets a day because he had no reason to believe they were habit forming.  This continued until May 2024 when Plaintiff Cavaliere realized he was addicted.  Plaintiff Cavaliere experienced severe withdrawals including depression, anxiety, body aches, cold sweats, chills, diarrhea, nausea, vomiting, and restless legs.  This was the moment Plaintiff Cavaliere realized Defendant did not tell the truth about its Products, and that he had become addicted to them.  Plaintiff Cavaliere could not believe that something without a warning could wreak havoc on his life and his finances.  Plaintiff Cavaliere had to seek medical attention for his withdrawal symptoms and was placed on suboxone to taper off Defendant's Product.  Had he known that Defendant's Products were highly addictive, or posed a risk of addiction, by way of a warning on the Product's packaging, he would have never purchased them.

65.    Plaintiff Dallas LeBlanc is a resident of Hawaii.  He first purchased Defendant's Products in or around May 2023, during which time he was a resident of California.  Plaintiff LeBlanc purchased Defendant's Products from a smoke shop in Huntington Beach, CA.  Plaintiff LeBlanc did not believe the Product to be harmful and was not aware that Defendant's Products carried a potential risk of being addictive. Plaintiff LeBlanc reviewed the Product's packaging before making his purchase and relied on Defendant's representations in deciding to purchase the Product.  A warning on the Product packaging would have corrected his belief, but there was none.  Plaintiff LeBlanc started with one to two tablets a day, but his tolerance quickly grew, and he worked up to four to five tablets a day because he had no reason to believe the Product was habit forming. Plaintiff LeBlanc realized he was addicted when one day he did not take Defendant's tablets and that same night woke up in a cold sweat, experiencing intense pain and body tremors.  Plaintiff LeBlanc had never experienced anything like that before.  Like Plaintiff Cavaliere, this was the moment Plaintiff LeBlanc realized Defendant did not tell the truth about its Products, and that he had become addicted to them.  Plaintiff LeBlanc is currently still addicted to Defendant's Products and is terrified of the withdrawal symptoms he will experience if he stops using the Products.  Had he known that Defendant's Products were

highly addictive, or posed a risk of addiction, by way of a warning on the Product's packaging, he would have never purchased them.

66. Defendant Alternative Ventures LLC., d/b/a PRESS'D, is a Wyoming corporation with its principal place of business in Wyoming. Defendant owns and operates the website www.itspressd.com, and also advertises, markets, distributes, and sells its 7-OH Products in California and throughout the United States.

## CLASS ALLEGATIONS

67. Plaintiffs bring this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all other Class members, defined as follows:

> All persons nationwide who, within the applicable statute of limitations period, purchased PRESS'D 7-hydroxymitragynine products (the "Nationwide Class").

> All persons who, within the applicable statute of limitations period, purchased PRESS'D 7-hydroxymitragynine products while in California (the "California Class").

68. Excluded from the Classes are Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of its respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiffs reserve the right to expand, limit, modify, or amend these Class definitions, including the addition of one or more subclasses, in connection with their motion for Class certification, or at any other time, based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

69. ***Numerosity***: The members of the Classes are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Classes contain at least thousands of consumers throughout California and the United States who have been damaged by Defendant's conduct as alleged herein. The precise number of members of the Classes is unknown to Plaintiffs at this time.

70. ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes. These common legal and factual questions include, but are not limited to, the following:

    a. whether the labels on Defendant's Products have the capacity to mislead reasonable consumers;

    b. whether Defendant knew that 7-OH is a highly addictive substance that causes physical and psychological dependence and opioid-like withdrawal symptoms;

    c. whether Defendant had a duty to disclose that 7-OH is addictive on its Products' packaging.

    d. whether Defendant's conduct alleged herein violated the FAL, CLRA, and UCL;

    e. whether Defendant's conduct alleged herein constitutes unjust enrichment;

    f. whether Defendant's conduct constitutes a fraudulent omission;

    g. whether Plaintiff and the Classes are entitled to damages and/or restitution; and

    h. whether an injunction is necessary to prevent Defendant from continuing to sell its PRESS'D Products without warning labels of its addictiveness or risk thereof.

71. ***Typicality***: Plaintiffs' claims are typical of the claims of the Classes in that Plaintiffs and the Class members sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to inform Plaintiffs and all others similarly situated that its Products are highly addictive, or pose a risk thereof, and are akin to opioids.

72. ***Adequacy***: Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no antagonistic or adverse interests to those of the Classes.

---

73.    *Superiority*: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Classes; the Classes are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

74.    Defendant has acted or failed to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

75.    Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiffs, members of the Classes, and the general public—who are also negatively impacted by the dregs of addiction—and will likely retain the benefits of its wrongdoing.

76.    Based on the forgoing allegations, Plaintiffs' claims for relief include those set forth below.

77.    Plaintiffs are informed that Defendant keeps extensive computerized records through its online sales data, as well as through, *inter alia*, general marketing programs. Defendant has one or more databases through which a significant majority of members of the Classes may be identified and ascertained, and Defendant maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

### FIRST CAUSE OF ACTION
**Violation of California's Unfair Competition Law ("UCL")**
**Business and Professions Code, §§ 17200,** *et seq.*

78.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs.

79.    Plaintiffs bring this cause of action individually and on behalf of the members of the proposed California Class against Defendant.

80. The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent, business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]" A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by unlawful and/or unfair business practices or acts.

81. As alleged below, Defendant has committed unlawful, fraudulent, and/or unfair business practices under the UCL by (a) representing that its 7-OH Products have certain characteristics that they do not, in violation of California Civil Code Section 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of California Civil Code Section 1770(a)(9); (c) selling addictive substances to unsuspecting consumers and profiting from their addiction; and (d) failing to disclose that its 7-OH Products pose a serious risk of addiction.

82. Defendant's conduct has the capacity to mislead a significant portion of the general consuming public and to target consumers, acting reasonably in the circumstances.

83. Defendant's conduct has injured Plaintiffs and the California Class they seek to represent in that they paid money for a Product that they would not have purchased or paid more than they would have but for Defendant's failure to disclose the addictive nature, or risk of addiction, of its 7-OH Products. Such injury is substantial and is not outweighed by any countervailing benefits to consumers or competition. Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's labels, and thus also Defendant omissions, consumers themselves could not have reasonably avoided such injury.

84. Moreover, Defendant's Products pose an unreasonable health hazard because 7-OH is highly addictive and may induce serious withdrawal symptoms. Accordingly,

Defendant had a duty to consumers to disclose on the Products' labels that its 7-OH Products pose a risk of physical and psychological dependence.

85.    Pursuant to California Business and Professions Code Section 17203, Plaintiffs and the California Class members seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiffs and the other California Class members; (b) disgorge all revenues obtained as a result of Defendant's violations of the UCL; and (c) pay Plaintiffs and the California Class members' attorney's fees and costs.

86.    Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Products is determined to be an amount less than the premium price of the Products.  Without compensation for the full premium price of the Products, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

## SECOND CAUSE OF ACTION
### Violation of California's False Advertising Law ("FAL")
### Business and Professions Code, §§ 17500, *et seq*.

87.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

88.    Plaintiffs bring this claim individually and on behalf of the California Class against Defendant.

89.    Defendant's acts and practices, as described herein, have deceived, and are likely to continue to deceive, California Class members and the public at large.  As described above and throughout this Complaint, Defendant failed to disclose that 7-OH is addictive, or carries a risk of addiction, on its Products' packaging.

90.    Defendant disseminated uniform advertising regarding its kratom Products to and across California.  This advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of the FAL.  Such advertisements were intended to, and likely did, deceive the consuming public for the reasons detailed herein.

---

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED                    23

91.     The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive because Defendant continues to misrepresent that its kratom-derivative Products are not addictive.

92.     Defendant knew, or should have known, that in making and disseminating these statements, its advertisements were untrue and misleading in violation of California law.  Defendant knows that 7-OH is addictive, or has a risk thereof, yet fails to disclose this fact to consumers.

93.     Plaintiffs and the California Class members purchased Defendant's Products based on Defendant's misrepresentations and omissions indicating that the Products are not addictive.

94.     Defendant's misrepresentations and non-disclosures of the material facts described herein constitute false and misleading advertising and, therefore, constitute a violation of the FAL.

95.     As a result of Defendant's wrongful conduct, Plaintiffs and California Class members lost money in an amount to be proven at trial.  Plaintiffs and the California Class are therefore entitled to restitution as appropriate for this cause of action.

96.     Plaintiffs and the California Class seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorney's fees and costs under California Code Civil Procedure Section 1021.5; and other appropriate equitable relief.

### **THIRD CAUSE OF ACTION**
**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code, §§ 1750, *et seq.***

97.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

98.     Plaintiffs bring this claim individually and on behalf of the California Class against Defendant.

99.  Plaintiffs and California Class members are consumers within the meaning of California Civil Code Section 1761(d) of the CLRA.

100.  Civil Code Section 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which she or he does not have."

101.  Civil Code Section 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

102.  Civil Code Section 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

103.  Defendant violated Civil Code Sections 1770(a)(5), (a)(7), and (a)(9) by failing to disclose that its 7-OH Tablets are addictive, or are potentially addictive, an unreasonable health hazard and necessarily a fact that is material to reasonable consumers.

104.  Defendant's misrepresentations and omissions deceived, and have a tendency and ability to deceive, the general public.

105.  Defendant has exclusive or superior knowledge of 7-OH's addictive nature, which was not known to Plaintiffs or California Class members.

106.  Plaintiffs and California Class members have suffered harm as a result of these violations of the CLRA, Civil Code Section 1750, because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid had they known that 7-OH has an addictive quality and causes withdrawals.  As a result, Plaintiffs and the California Class are entitled to actual damages in an amount to be proven at trial, reasonable attorney's fees and costs, declaratory relief, and punitive damages.

107.  On August 8, 2024, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all respects with Section 1782(a).  The letter was sent via certified mail, return receipt requested, and advised Defendant that it was in violation of the CLRA and demanded Defendant cease and desist from such violations and make full restitution by

refunding the monies received therefrom.  The CLRA letter stated that it was sent on behalf of all other similarly situated purchasers.

**FOURTH CAUSE OF ACTION**
**Breach of Implied Warranty**

108.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

109.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class against Defendant.

110.   Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that 7-OH is not addictive and does not cause opioid-like withdrawal symptoms because it did not provide disclosure on the Products' packaging stating otherwise.

111.   Defendant breached its warranty implied in the contract for the sale of its 7-OH Products because the Products could not pass without objection in the trade under the contract description: the 7-OH Products were not adequately contained, packaged, and labeled as per Defendant's contract with Plaintiffs and the Nationwide Class members, and the Products do not conform to the implied affirmations of fact made on the marketing and packaging for the Products that the Products are not addictive, are not potentially addictive, and do not cause withdrawals.  U.C.C. §§ 2-313(2)(a), (e), (f).  As a result, Plaintiffs and the members of the Nationwide Class did not receive the goods as impliedly warranted by Defendant to be merchantable.

112.   Plaintiffs and the Nationwide Class members purchased the 7-OH Tablets in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

113.   The 7-OH Products were defective when they left Defendant's exclusive control.

114.   Plaintiffs and the Nationwide Class did not receive the goods as warranted.

115.   As a direct and proximate cause of Defendant's breach of its implied warranty, Plaintiffs and the Nationwide Class have been injured and harmed because (i) they would

not have purchased Defendant's Products on the same terms if they knew that the Products were addictive and could cause opioid-like withdrawal symptoms; and (ii) the Products do not have the characteristics, uses, or benefits as promised by Defendant.

116.    On August 8, 2024, prior to filing this action, Defendant was served with a pre-suit notice letter on behalf of Plaintiffs that complied in all respects with U.C.C. Sections 2-314 and 2-607.  Plaintiffs' counsel sent Defendant a letter advising Defendant that it breached an implied warranty and demanded Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment

117.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as fully stated herein.

118.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class members against Defendant.

119.    Plaintiffs and the Nationwide Class conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

120.    Defendant had an appreciation or knowledge of the benefit conferred on it by Plaintiffs and the Nationwide Class members.

121.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and the Nationwide Class members' purchases of the Products, and retention of such revenues under these circumstances is unjust and inequitable because Defendant failed to disclose on the Products' packaging that the Products were addictive, or were potentially addictive, and similar to opioids.  This caused injuries to Plaintiffs and the Nationwide Class because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

122.    Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiffs and the Nationwide Class members.

123.   Defendant has thereby profited by retaining the benefit under circumstances that would make it unjust for Defendant to retain the benefit.

124.   Plaintiffs and the Nationwide Class members are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

125.   As a direct and proximate result of Defendant's actions, Plaintiffs and the Nationwide Class members have suffered in an amount to be proven at trial.

126.   Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Products is determined to be an amount less than the premium price of the Products, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

127.   Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, *i.e.*, in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

## SIXTH CAUSE OF ACTION
### Fraud by Omission

128.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

129.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class against Defendant.

130.   Defendant distributed its Products throughout the United States, including within the State of California.

131.   Defendant misrepresented that its 7-OH Products had attributes or qualities that they do not have by failing to disclose that 7-OH is addictive, or is potentially addictive, and can cause opioid-like withdrawal.

132.   Defendant knows that 7-OH is addictive because it employs a highly specialized lab to isolate and extract 7-Hydroxymitragynine from kratom, and because it has received consumer reports of addiction and withdrawal.

133.   Defendant knows that knowledge of 7-OH's addictive nature, or even potentially addictive nature is a material fact that would influence the purchasing decisions of reasonable consumers because addiction is an unreasonable health hazard.

134.   Defendant therefore had a duty to Plaintiffs and to the Nationwide Class members to disclose that 7-OH is addictive, or has a risk of being addictive, and can cause withdrawals on the Products' packaging.

135.   Consumers reasonably and justifiably relied on Defendant's omissions, because it is reasonable to assume that a product that is addictive, or has a risk of being addictive, like an opioid, would bear a warning on its packaging.

136.   As a result of Defendant's omissions, Plaintiffs and the Nationwide Class paid for 7-OH Products they may not have purchased, or paid more for those Products than they would have, had they known the truth about 7-OH.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, and on behalf of the Classes, respectfully request this Court award relief against Defendant as follows:

a. An order certifying the Classes and designating Plaintiffs as the Class Representatives and their counsel as Class Counsel;

b. award Plaintiffs and members of the Classes actual, consequential, punitive, and statutory damages, as appropriate;

c. award restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the members of the Classes as a result of Defendant's unlawful, unfair, and fraudulent business practices described herein;

d. award declaratory and injunctive relief as permitted by law or equity, including enjoining Defendant from continuing its unlawful practices set forth herein, and directing Defendant to identify, with Court supervision, victims of its misconduct and pay them all money they are required to pay;

e. order Defendant to engage in a corrective advertising campaign;

f. award attorneys' fees and costs; and

g. award any other further relief as the Court may deem necessary or appropriate.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: January 6, 2025

**BURSOR & FISHER, P.A.**

By: _/s/Neal J. Deckant_
       Neal J. Deckant

Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
Karen B. Valenzuela (State Bar No. 357231)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ndeckant@bursor.com
            lsironski@bursor.com
            kvalenzuela@bursor.com

**LYNCH CARPENTER, LLP**
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Scott G. Braden (SBN 305051)
scott@lcllp.com
1234 Camino del Mar
Del Mar, CA 92014
Tel:     619-762-1910
Fax:     858-313-1850

*Attorneys for Plaintiffs and
Proposed Class Counsel*

## **CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Neal J. Deckant, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth in this declaration and as called as a witness, I could and would completely testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Central District of California, as Defendant is alleged to have advertised, marketed, manufactured, distributed, and/or sold the Product at issue to Class Members in this District.  Plaintiff David Cavaliere alleges that he resides in Alhambra, California.  Plaintiff Dallas LeBlanc alleges he purchased the Products in Huntington Beach, California.

3.      I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Walnut Creek, California this January 6, 2025.


        */s/ Neal J. Deckant*
        Neal J. Deckant